IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

DELMA BANKS, JR.,                          §
         Petitioner
                                §

vs.                                        §           No. 5:96CV353
                              §          JUDGE DAVID FOLSOM
NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,      §
Correctional Institutions Divisions,
         Respondent                      §

**MEMORANDUM OPINION**

On October 19, 2007, a Memorandum Opinion was electronically signed and entered in this case. The October 19, 2007 Opinion was an early draft and was mistakenly entered due to a clerical error. Thus, the October 19, 2007 Opinion is hereby vacated and this Memorandum Opinion is issued in its place.

On March 23, 2006, United States Magistrate Judge Caroline Craven signed a Report and Recommendation recommending that Delma Banks, Jr.'s ("Petitioner") writ of *habeas corpus* be denied. (Doc. 181).[1] The Report and Recommendation found that Petitioner's *Brady* claim on the issue of an undisclosed pre-trial interview transcript of witness Cook ("Cook Transcript") from September of 1980 was tried by implied consent in a federal proceeding but also found it was not material under *Brady*. Both parties filed objections to the Magistrate Judge's Report and Recommendation (Docs. 184-185), and on June 1, 2006, this Court held a hearing to address those objections. (Doc. 188). Under 28 U.S.C. §636(b)(1)(C), this Court conducted a *de novo* review of

---

[1] The docket numbers for this case are referenced by the designation "Doc."

the Magistrate Judge's recommended findings.  Upon due consideration of the record, including the

evidence produced at the hearing and the arguments of counsel, this Court adopts the Magistrate

Judge's Report and Recommendation in part, and modifies it in part.

The facts and procedural history of this case are set forth in the Magistrate Judge's Report

and Recommendation (Doc. 181) and will not be repeated here.  The Court will address the parties'

objections, beginning first with those of Respondent Nathaniel Quarterman ("Director").

## 1. Director's Objection to the Implied Consent Finding

The Director objected to the Magistrate Judge's recommended finding that Petitioner's

unpleaded *Brady* claim was tried by implied consent during the federal *habeas* evidentiary hearing

held on June 7 and 8, 1999.  (Doc. 185).  However, the Director has not raised any new arguments

in his objections that cause this Court to question the Magistrate Judge's findings on the implied

consent issue.  The Court agrees with the Magistrate Judge's determination that the questioning

during the evidentiary hearing put the Director on notice of the Cook Transcript *Brady* claim, that

there was no objection to the introduction of the transcript, and that the Director had a fair

opportunity to litigate the issue.

In particular, witness James Elliott was questioned by Petitioner's counsel, the content of

which clearly brought to light the subject of Cook's testimony being coached.  In response, the

Director provided Elliott an opportunity to explain the method by which law enforcement

interviewed Cook, including how it is common for law enforcement to have a witness clarify

comments made in an earlier statement to police.  The Director's argument that the Cook Transcript

was introduced as evidence to counter Petitioner's *Brady* claim that there was an undisclosed deal

between Cook and law enforcement to drop pending charges against Cook, and therefore, did not

2

object to the evidence, continues to be unpersuasive.  Accordingly, the Court adopts the findings on

the issue of implied consent in the Magistrate Judge's Report and Recommendation.

**2. Petitioner's Objection to the *Brady* Finding**

As for the recommended finding in the Magistrate Judge's Report and Recommendation that

the Cook Transcript was not material under *Brady*, Petitioner objects that the Report approaches

*Brady's* standard for materiality too narrowly.  (Doc. 184).  Petitioner argues that the Court should

follow the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419 (1995), which requires a court

to consider non-disclosed evidence collectively in determining whether there has been a *Brady*

violation.  Petitioner also objects on the basis that the Magistrate Judge refused to consider post-trial

evidence in making a materiality determination.

As noted in the Magistrate Judge's Report and Recommendation, pursuant to *Brady v.*

*Maryland,* 373 U.S. 83 (1963), the prosecution cannot withhold evidence that is favorable to an

accused and that is material to either guilt or punishment.  The prosecution violates *Brady* if this type

of evidence is withheld, regardless of whether the prosecution withheld this evidence in good faith.

*Id.*  In order for an accused to establish that *Brady* has been violated and that a writ of *habeas corpus*

should be granted, he or she must show that the withheld evidence (1) was favorable to his or her

case, (2) was suppressed by the prosecution either willfully or inadvertently, and (3) caused prejudice

or was material.  *Strickler v. Greene,* 527 U.S. 263, 280-82  (1999).  The Director does not contest

that the second *Brady* requirement has been met in this case.  (Doc. 180-1, P. 31).  Instead, the

Director argues that the first and third *Brady* requirements have not been met.  *Id.*

Under *Brady's* first requirement, "favorable evidence" is any evidence that "if disclosed and

used effectively . . . may make the difference between conviction and acquittal."  *United States v.*

*Bagley,* 473 U.S. 667, 676 (1985).  Favorable evidence includes both exculpatory and impeachment

evidence.  *Id.*  Also, under *Brady,* evidence is  "material"  if  there is a reasonable probability of a

different result had the prosecution disclosed the evidence.  *Kyles*, 514 U.S. at 434.  A reasonable

probability of a different result is shown when the suppression "undermines confidence in the

outcome of the trial."  *Id*.  In *Kyles*, the Supreme Court reiterated that

> a showing of materiality does not require demonstration by a preponderance that
> disclosure of the suppressed evidence would have resulted ultimately in the
> defendant's acquittal. [The] touchstone of materiality is a "reasonable probability"
> of a different result, and the adjective is important.  The question is not whether the
> defendant would more likely than not have received a different verdict with the
> evidence, but whether in its absence he received a fair trial, understood as a trial
> resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434.  The Fifth  Circuit also addressed *Brady's* standard for materiality in *United*

*States v. Sipe,* 388 F.3d 471 (2004), and noted that impeachment evidence is material if that evidence

"would seriously undermine the testimony of a key witness on an essential issue or there is no strong

corroboration [of that witness's testimony]."  *Id.* at 478.

Under the facts of this case, this Court finds that the Cook Transcript is both favorable to

Petitioner as impeachment evidence and was material in Petitioner's case.  First, the Cook Transcript

is favorable to Petitioner as impeachment evidence primarily because it establishes that Cook was

extensively coached just days before  giving his testimony at trial.  The Cook Transcript contains

repeated instances where the investigators told Cook that his story was inconsistent and needed to

be altered.  (Doc.180-4).  At one point, the  investigator told Cook, "Your statement is obviously

screwed up" and then later helped Cook change his statement and advised Cook how his statement

should "read."  *Id.* at 24-26.  The impeachment value of this transcript is even greater in this case

because, during his testimony at Petitioner's trial, Cook expressly denied having been coached.

This transcript is also favorable because it provides information regarding Cook's state of mind at the time he signed the April 1980 affidavits.[2]  This transcript shows that, at the time he signed these affidavits, Cook was scared of going to jail, *Id.* at 26, 31, was under the influence of alcohol, *Id.* at 16-17, and was probably not alert.  *Id.* at 16-17.  This transcript is also favorable because it highlights a number of inconsistencies between Cook's proposed trial testimony and his actual trial testimony.  In this interview, Cook was asked to recite the facts he remembered that led up to the murder and that took place after the murder.  This recitation presumably would have been Cook's trial testimony had Cook not been interviewed prior to trial.  Cook's recitation of the facts during the September of 1980 interview was, in several instances, inconsistent with his statements in his April 1980 affidavits and included additional facts that were not contained in his April 1980 affidavits.  These inconsistencies and additional facts were noted by the investigators who prompted Cook to change his responses.

For example, during this interview, the investigator noted that Cook's statement about the first time he noticed Petitioner's gun was inconsistent with his April 1980 affidavits.  *Id.* at 27.  The investigator noted Cook, in his April 1980 affidavits, claimed that he first noticed Petitioner's gun while it was in Petitioner's jacket, but that in his recitation of the facts, Cook stated that he first noticed Petitioner's gun while it was in the console of Petitioner's car.  *Id.*  Based upon the investigator's noting this inconsistency, Cook was able to prepare his testimony for trial and clarified his response by stating that he had first seen the pistol in the console of the car in the morning and then first saw the pistol in his house that night when it was in Petitioner's jacket.  *Id.*  Because the

---

[2] Cook signed two affidavits–an original and a supplemental–on April 24, 1980.  These affidavits are referred to as the "April 1980 affidavits" throughout this opinion.

investigator was able to clarify Cook's testimony and coach Cook, Cook's testimony was almost

certainly much better at trial than his testimony would have been had he not been coached.  Thus,

based upon the foregoing, the Cook Transcript was clearly favorable to Petitioner as impeachment

evidence. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (holding that "beyond genuine debate that

suppressed evidence relevant here, Farr's paid informant status, qualifies as evidence advantageous

to Banks.").     Second, the record also establishes that Cook's testimony was material and that the

prosecution's failure to disclose the Cook Transcript "undermines confidence in the outcome of the

trial" and prejudiced Petitioner.  This determination is based upon on the following three key

findings: (1) Cook's testimony was both uncorroborated and was central to the prosecution's case

at the guilt phase of the trial; (2) Cook misrepresented the fact that he had been coached, and the

prosecution improperly relied upon that misrepresentation; and (3) Cook substantially altered his

testimony in response to the coaching that he received just prior to the trial.

### A. Importance of Cook's Testimony

The State can hardly dispute the fact that Cook's testimony was of primary importance at the

guilt phase of Petitioner's trial.  In its opening statement at Petitioner's trial,  the State recognized

Cook's testimony was "critical" in the case against Petitioner.  The State also repeatedly mentioned

Cook's testimony in its closing arguments.  Even the Supreme Court noted that Cook was a key

witness during Petitioner's trial.    *See Banks,* 540 U.S. at 675.

Although there were several State witnesses who testified about different aspects of the

crime, Cook was the only witness to testify that Petitioner confessed to murdering the victim, as well

as the only witness to give a motive for Petitioner committing the crime, and, importantly, Cook's

testimony on these issues was uncorroborated.  No other witness could verify the fact that Petitioner

had confessed and no other witness could supply a motive for Petitioner's commission of this crime. Cook stated that one evening while Petitioner was staying at Cook's grandparent's house in Dallas, Petitioner both confessed to killing the victim and stated that Petitioner said "he decided to kill the white boy for the hell of it."

Furthermore, Cook's importance as a witness during the guilt phase of Petitioner's trial is remarkably similar to Farr's importance as a witness during the punishment phase of Petitioner's trial. In fact, the Supreme Court found that both Cook and Farr were "essential prosecution witnesses." *Id.* Farr testified during the punishment phase of Petitioner's trial and stated that Petitioner posed a danger to society because he was willing to commit and assist in robberies. Even though there was another witness who testified on behalf of the State at the punishment phase and even though Farr's testimony was partially corroborated (by Petitioner himself), the Supreme Court found that Farr's testimony was of primary importance at the punishment phase of Petitioner's trial. *Id.* at 678-98. The Supreme Court noted that Farr's testimony was very important because it was not fully corroborated and also because it was heavily relied upon by the State, who stated that Farr's testimony was "of the utmost significance." *Id.* at 681. The same is also true of Cook's testimony, which was both uncorroborated and was heavily relied upon by the State.

**B. Cook's Misrepresentation During Trial**

Even more central to Petitioner's *Brady* argument is the fact that Cook testified three times at Petitioner's trial that he did not speak to anyone about this case prior to trial. The Cook Transcript, however, reveals that Cook did, in fact, have an extensive conversation with investigators just prior to his trial testimony. The Director's assertion that Cook understood the question to mean whether he had spoken to anyone *outside of law enforcement* about the case is unconvincing.

Defense counsel specifically asked Cook if Mr. Rafaelli, the District Attorney prosecuting the case, had "just put you on the stand, not knowing what you were going to testify to." Cook responded, "That's what I'm telling you." The State not only allowed this erroneous testimony to stand uncorrected, but it also represented to the jurors during closing argument that Cook "didn't budge from the truth" and that Cook "didn't hide anything from you . . . [he] brought you the absolute truth." *See Graves v. Dretke*, 442 F.3d 334, 341 (5th Cir. 2006), *petition for cert. filed*, 74 U.S.L.W. 3704 (U.S. May 31, 2006) (No. 05-1568) (although State's star witness made inconsistent statements in suppressed evidence, prosecution emphasized witness's consistency)  As the Supreme Court stated, "the prosecution allowed Cook's misstatements to stand uncorrected." *Banks*, 540 U.S. at 677.

Notably, Cook's misrepresentations during the guilt phase of the trial are remarkably similar to Farr's misrepresentations during the penalty phase of the trial, which the Supreme Court found were material for *Brady* purposes. *See Banks,* 540 U.S. at 694. As noted by the Supreme Court, "Farr repeatedly misrepresented his dealings with police; each time Farr responded untruthfully, the prosecution allowed his testimony to stand uncorrected." *Id.* The Supreme Court found that these misrepresentations caused the jury to be ignorant "of Farr's true role in the investigation and trial of the case" which unfairly prejudiced Petitioner. *Id.* at 675-703 (stating, "when police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."). Then, based upon this finding, the Supreme Court determined that this information was material for *Brady* purposes. *Id.* at 703; *See Kirckpatrick v. Whitley,* 992 F.2d 491, 497 (1993).

Cook's misrepresentation at trial–claiming that he had not been coached–is particularly

significant in light of how extensively Cook was coached.  In the thirty-eight (38) page Cook

Transcript, the investigators repeatedly questioned Cook about the affidavits he signed in April of

1980,  and as the Supreme Court noted, "extensively coached" Cook. *Banks,* 540 U.S. at 675.  For

example, the investigators pointed out Cook's inconsistent recollection of the events leading up to

his signing the April 1980 affidavits.  Cook initially stated during the interview that the authorities

had not told him anything prior to his signing those affidavits.  The transcript, however, shows that

Cook later stated in the interview that before he signed the April 1980 affidavits, the authorities told

Cook the day that the crime occurred, that Petitioner was wanted for murder, and that the victim was

a white male.  The investigators noted Cook's inconsistency:  "Now, see you told me that you that

they [sic] didn't tell you anything.  They just put you in a room and told you to start writing and now

you've come up with two or three things they've told you." (Doc. 180-4, P. 20).  Also, in going over

his April statement, the interviewer pulled out portions he wants Cook to clarify, but in doing so, told

Cook "[y]our statement is obviously screwed up . . . your statement doesn't make any sense . . . the

way this statement should read is . . . ." *Id.* at 24-26.  These examples, as well as other examples in

the transcript, establish that Cook was heavily coached prior to testifying at trial, which makes

Cook's testimony at Petitioner's trial–that he was not coached–even more egregious.

### C. Cook's Altered Responses

Cook's Transcript also demonstrates that Cook altered his testimony at trial in response to

the extensive coaching he received during his September of 1980 interview.  There are at least two

examples of Cook altering his testimony in response to the investigator's coaching.  First, during his

testimony at trial, Cook "forgot" whom he had assaulted in an unrelated crime after he was

interviewed.  Cook testified at trial that he was convicted of felony assault but that he could not

remember whom he had assaulted.  The Cook Transcript, however,  reveals that Cook had told investigators just a few days before trial that he had assaulted a *school teacher*.  The Director suggests that Cook meant that he forgot the name of the person he assaulted, but the assault victim's name is clearly not what the defense was seeking.  Furthermore, while Cook could have forgotten the details of this particular incident between the time he was interviewed by law enforcement and the time he gave his trial testimony, the hand written "do not say" note in the margin of Cook's Transcript next to Cook's comment that he assaulted a school teacher, *Id.* at 33, makes Cook's trial testimony, and the Director's explanation, suspect.

Second, Cook altered his response regarding Petitioner's motive for killing the victim in response to the investigator's coaching at the September of 1980 interview. In his April 1980 affidavits and in his trial testimony, Cook stated that Petitioner killed the victim "for the hell of it." In the pre-trial interview, however, Cook stated that Petitioner told him he had killed the victim because he wanted the victim's car.  *Id.* at 8-9.  The investigators then coached Cook into changing his answer back to the motive he stated in his April 1980 affidavits.  *Id.* at 38.  The investigators did this by pointing out the fact that the victim's car was in bad condition and often had to be "jumped." *Id.*  The investigators indicated that because this car was in bad condition, this car would not motivate someone to commit murder.  *Id.*  Then, after all of this coaching and presumably in order for his testimony to be consistent with his April 1980 affidavits, Cook changed his testimony at trial back to his original testimony: that Petitioner wanted to kill "for the hell of it."

Had the defense been able to cross-examine Cook on the suppressed statement, the defense may have persuaded one or more jurors to reject Cook's trial version of events.  Several inconsistencies in Cook's testimony came to light in the transcript, and while each inconsistency by

itself might not have had much impact on the case, taken together, they had the potential to significantly affect the jurors' impression of Cook. *See Kyles*, 514 U.S at 449 n.19 (noting combined effect of suppressed evidence).  The transcript also demonstrates the interview tactics and demeanor of the investigators which may have swayed the jury into believing Cook's testimony was coached, and ultimately, might have caused the jury to distrust the prosecution. *See id*. at 443 n.14 (finding "implication of coaching would have been complemented by the fact that [witness's] testimony at the second trial was much more precise and incriminating than his testimony at the first . . . .").

### 3. Conclusion

For these reasons, the Court finds that the Cook pre-trial transcript is both favorable and material under *Brady*.  Petitioner has satisfied his burden of showing a reasonable probability that there would have been a different result in this case had the transcript been disclosed to the defense. The combination of the importance of Cook's testimony to the case against Petitioner, the coaching by authorities revealed in the transcript, the otherwise unknown inconsistent statements, and the prosecution's failure to correct false testimony lead the Court to conclude "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435  This Court hereby adopts the recommended findings of the Magistrate Judge's Report and Recommendation on the issue of implied consent, and modifies the recommended findings on the issue of the materiality of pre-trial Cook Transcript.

SIGNED this 1st day of April, 2008.

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

11